**LONG ISLAND TANKERS CORPORATION, a corporation, Libelant,**

and

**John A. Cross et al., Libelants in Intervention,**

v.

**S. S. KAIMANA, her engines, etc., et al., Respondents.**

**Nos. 28019, 28026, 28094, 28107, 28223, Admiralty No. 28019.**

United States District Court
N. D. California.

Feb. 9, 1967.

---

John Hays and George L. Waddell of Dorr, Cooper & Hays, San Francisco, Cal., for libelant in No. 28019 and for respondent in Nos. 28094, 28107 and 28026.

John Paul Jennings of Jennings, Gartland & Tilly and Richard Ernst, San Francisco, Cal., and Marvin C. Taylor, Washington, D. C., for libelants in intervention in Nos. 28019 and 28026 and for libelants in Nos. 28094, 28107 and 28223.

Harold L. Witsman and John F. Meadows, U. S. Admiralty and Shipping Section (West Coast Office) and Cecil F. Poole, U. S. Atty., San Francisco, Cal., for respondent in No. 28223.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

This is a consolidation of five separate libels *in rem* involving claims by the trustees of certain so-called vacation, pension and welfare trusts against each of five vessels—SS Lanikai, SS Alaska Bear (now owned by Pacific Far East Line, Inc.), SS Kaimana, SS Lanakila (upon which Pacific Far East Line, Inc., is holder of preferred ship mortgages) and SS Coast Progress (upon which the United States is holder of a preferred ship mortgage).

The Court has jurisdiction of the parties and subject matter under U.S.Const. art. III, § 2; 28 U.S.C. § 1331(a); and 46 U.S.C. §§ 951, 953.

The cases are presently before the Court for decision after trial upon a "Stipulation as to Certain Facts and Other Matters" and certain testimony and exhibits introduced at trial. The evidence introduced at trial was largely explanatory of the provisions of the collective bargaining agreements governing the trusts.

Under the provisions of these collective bargaining agreements between Pacific Maritime Association, representing steamship companies and various maritime unions, representing sea-going personnel, certain vacation, pension and welfare trusts were established and placed under the administration of trustees equally divided between persons designated by Pacific Maritime Association and persons designated by the unions.

The collective bargaining agreements provide for the payment of vacation pay, pensions and welfare benefits by the trustees to designated beneficiaries. These beneficiaries include not only the

various sea-going personnel but also shore-based union officials, instructors at schools for seamen, shore-based workmen repairing and maintaining cargo vans and personnel administering the trusts herein.

The collective bargaining agreements also provide the method of financing such benefits. Under the agreements the steamship companies are obligated to make contributions to the trustees of the various trusts through the Pacific Maritime Association. These contributions are based upon the number of days of work performed for each steamship company by covered employees and the job classification of the particular employee.

The libels *in rem* here involved are based upon claims by the trustees against Coastwise Line and Dorama, Inc., both steamship companies bound by the collective bargaining agreement, for contributions due and owing to the trustees as a result of the operation by Coastwise Line of each of the five vessels herein and the operation by Dorama, Inc., of three of them. During these operations work was performed for these steamship companies by sea-going personnel covered by the collective bargaining agreement.

Coastwise, however, failed to pay its contributions for voyages which terminated during the period of February 1959 through February 23, 1960, and is now insolvent.

Dorama failed to pay its contributions for voyages terminating during the period of June 23, 1959, through February 25, 1960, and is now insolvent.

The basic issue involved in all five proceedings is whether the trustee's claims for the contributions which became due and owing from Coastwise Line and from Dorama, Inc., can be asserted as maritime liens and, if so, whether they are entitled to "preferred" maritime lien priority against said vessels as "wages of the crew of the vessel" within the meaning of 46 U.S.C. § 953.

Section 953 of Title 46 is part of Chapter 25 of Title 46 dealing with ship mortgages and known as the Ship Mortgage Act, 41 Stat. 1000–1006 (1920), 46 U.S.C. §§ 911–984 (1964).

Prior to 1920 ship mortgages were not entitled to enforcement by maritime liens and were subordinate to all of the many maritime liens a ship might incur. See Bogart v. The John Jay, 17 How. 399, 58 U.S. 399, 15 L.Ed. 95 (1854). For this reason they came to be "practically worthless" as security instruments. See Detroit Trust Co. v. The Barlum, 293 U.S. 21, 39, 55 S.Ct. 31, 79 L.Ed. 176 (1934). The Congress, in order to provide for the promotion and maintenance of the American merchant marine, enacted this Ship Mortgage Act to make private investment and credit in the shipping industry more attractive and also to protect the United States as one of the principal sources of credit for ship financing. See Gilmore and Black, The Law of Admiralty 571 (1957). This was accomplished by placing ship mortgages upon a stronger security basis.

The Ship Mortgage Act provides that mortgages which comply with the conditions enumerated in 46 U.S.C. § 922 shall be called "preferred mortgages" and as such entitled to the preferred status given by 46 U.S.C. § 953. See 46 U.S.C. § 922(a), (b).

Section 953 of the Act provides that in any foreclosure and sale of a ship in admiralty, all preexisting lien claims in the vessel shall be held terminated and shall thereafter attach to the proceeds of the sale except that a "preferred mortgage lien" shall have priority over all such claims *except* "preferred maritime liens" and expenses, fees and costs allowed by the Court.

Section 953(a) provides that the term "preferred maritime lien," as used in the chapter, means (1) a lien arising prior in time to the recording of a preferred mortgage or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband or agent of the vessel, "for wages of the crew of the vessel" for general average and for salvage. The Ship Mortgage

Act does not further define the term "wages of the crew of the vessel."

A threshold question is whether Congress intended by the phrase "wages of the crew of the vessel" as used in Section 953, to include all seamen's lien claims for compensation for maritime service or intended only a more limited kind of seamen's maritime lien claim. The trustees contend that Congress intended to protect the traditional seaman's wage lien claims and did so by providing that "wages of the crew of the vessel" have priority over preferred ship mortgages.

■ Admiralty courts have not limited the seaman's lien claim to those for ordinary wages. On the contrary, the Courts have recognized the seaman's lien claim for compensation for maritime services regardless of the form of the compensation provided only that the claim is reducible to money. See Harden v. Gordon, 11 Fed.Cas. p. 480, No. 6,047 (C.C.Me.1823). From the earliest period of maritime commerce the test in admiralty courts for determining whether there is a seaman's wage lien has been: Has a maritime service been performed? If such service has been performed, then whatever constitutes the compensation for the service, if reducible to money, may be enforced by a maritime lien against the vessel upon which those services were performed.

In Gayner v. The New Orleans, 54 F. Supp. 25 (N.D.Cal.1944) the Court (Goodman, J.) allowed seamen's wage liens for dismissal cash benefits due ferry-boat employees under their collective bargaining agreements as a result of the abandonment of ferry-boat service in San Francisco Bay. The Court rejected the contention of the respondent that the ferry-boat company and not the vessel was responsible for the payment of such benefits under the collective bargaining contract and that the benefits were not in their nature such wages or compensation as entitled a seaman to a maritime lien, stating at 27: " * * * that the fullest protection to seamen for all *maritime services* has always been the policy of the Admiralty."

In The Great Canton, 299 F. 953 (E.D. N.Y.1924) the Court rejected a contention that the seaman's entitlement to one month's wages for improper discharge under 46 U.S.C. § 594 and for two days' pay for each and every day wages are withheld after a specified period under 46 U.S.C. § 596 is against the master or owner and not a lien against the vessel. Going back to the early case of Sheppard v. Taylor, 5 Pet. 674, 709–710, 8 L.Ed. 269 (1831), wherein Justice Story wrote of the remedies of seamen against the vessel, the Court upheld the seaman's maritime lien for this statutory compensation. See also The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903) (seaman's wage lien upheld for maintenance and cure resulting from a seaman falling sick in the service of the ship) and Lakos v. Saliaris (The Leonidas), 116 F.2d 440 (4th Cir. 1940) (seaman's wage lien upheld for extra compensation for hazardous maritime service in a war zone).

For purposes of decision in this case, but without deciding the question, the Court will assume that the phrase "wages of the crew of the vessel", as used in § 953, was intended to include the traditionally broad seaman's lien claim and to give all such lien claims priority over ship mortgages.

The remaining and basic question is whether the claim for the contributions here involved constitutes seamen's claims for compensation for maritime services in the broad traditional sense.

In each of the cases above mentioned, the compensation in question had become due to the seamen and the only question was whether the form of the compensation was such as to bring the claim within the protection of the seaman's maritime lien.

In the pending case the contributions in question are due and payable, not to the seamen, but to the trustees. The collective bargaining agreement expressly states that the contributions from the steamship companies are payable

only to the trustees, not the employees, and that covered employees have no right, title, interest or claim in or to their employer's or any other employer's contributions to the trust funds.

The contributions in question are not for pension, vacation or welfare benefits due to any particular seaman because such benefits are necessarily computed on a different basis than the contributions from the steamship companies.

Under the collective bargaining agreement benefits to a particular seaman are computed according to the number of days of his covered employment over a specified period provided a minimum number of days are worked by the particular employee during the period. In the computation all days worked by the seaman for any of the steamship companies covered by the agreements are included and totaled.

The amount of the benefit, thus computed, to which a particular covered employee may become entitled bears no direct relationship to the amount of contributions to the trustees from any particular steamship company.

On the other hand, the contributions of the steamship companies, including, of course, Coastwise Line and Dorama, Inc., are computed according to the number of days of covered employment worked by covered employees for the particular steamship company and the job classification of those employees.

Further, although contributions for union officials are made by the unions and contributions for trust personnel by the trust, itself, steamship company contributions are made for work performed, not by seamen, but by seamen school instructors and shore based workmen maintaining cargo vans.

Further, the agreements provide for annual review of the operations of the trust fund plans and for an increase in the rate of steamship company contributions whenever necessary to assure that the trusts will be sufficient to meet all benefits to which covered employees may be entitled. These trust funds are also financed in part by income on investment of trust funds.

In the pending case the claims of the trustees are not for any pension, vacation or welfare benefits due to any particular seaman. No seaman claims nonpayment of any such benefit. It appears from the Stipulation of Facts that all seamen who performed maritime service for Coastwise and Dorama have received and will continue to receive from the trustees all such benefits to which they were or may become entitled notwithstanding the failure of Coastwise and Dorama to make the contributions based upon the maritime services of those seamen.

On the other hand, no benefits are paid to seamen who do not work the required minimum number of days during the specified period even though the steamship employer makes its contributions for the days worked by them.

It appears, therefore, that the claims of the trustees are solely for contributions due from Coastwise and Dorama to the trusts. Those contributions are a means of financing the trust funds but they do not constitute the compensation to which any particular seaman is or may become entitled.

In our opinion, therefore, the claims of the trustees for the contributions in question do not constitute claims enforceable as seamen's maritime liens in the statutory or traditional maritime sense.

This conclusion does not foreclose the right of seamen to enforce their claims for pension, vacation or welfare benefits by maritime lien. We are not called upon to determine in this case whether sea-going personnel, entitled to vacation, pension or welfare benefits under the collective bargaining agreement, have a right to enforce such claim in the event of non-payment from the trust by means of a maritime lien, either in the traditional sense or in some narrower statutory sense, upon the ship or ships of any particular steamship company for whom they rendered maritime services or upon

the ships of all steamship companies' parties to the agreement.

Such claims of seamen for unpaid pension, vacation or welfare benefits stand on an altogether different footing than the contributions from the steamship companies.

█ The seamen's claims for unpaid benefits are clearly for the protection of the seaman but claims of the trustees for contributions from certain steamship companies are more for the protection of the other steamship companies against increase of their rate of compensation by reason of default of one or some of them.

As far as the seamen are concerned, even the default of all the steamship companies would not deprive the seamen of their claims of lien against the ships for benefits which might possibly become due to them but remain unpaid. Such claims would still be enforcible by the seaman's maritime lien unless (as might be contended in the light of the peculiar provisions of the collective bargaining agreement) such claims, even when made for benefits by or for the seamen themselves, be deemed incapable of allocation to any particular ship upon which the seaman in question performed maritime service—a question we are not called upon to decide.

Libellant trustees argue that their claim for the contributions are solely for the benefit of the seamen and that, therefore, the trustees must be considered as standing in the shoes of the seamen—in effect—assignees or trustees of their claims.

█ It is well established that an assignee (and, we assume, a trustee) of a seaman may enforce the wage lien of the assignor or beneficiary. See The President Arthur, 25 F.2d 999 (S.D.N.Y. 1928). See also United States v. Embassy, 359 U.S. 29, 34, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959).

However, in the pending case, as in *Embassy,* the contributions (as distin-

guished from the benefits themselves) are owed only to the trustees—not to the seamen.

The question presented in this case has previously been before the Courts. In Brandon v. SS Denton, 302 F.2d 404, 415–416 (5th Cir. 1962) the Court had before it a situation identical with that now before this Court. Various seafaring unions and others contended that contributions owed by steamship companies under pension, welfare and vacation plan funds (substantially similar to those here involved) were the equivalent of "wages of the crew of the vessel" within the meaning of § 953 and, therefore, secured by a preferred maritime lien and entitled to priority over preferred ship mortgages. The Court, affirming the District Court, The Denton, 1960 A.M.C. 2264 (S.D.Texas 1960)[1] and the report of Commissioner Ross therein, held to the contrary.

Shortly after the District Court's 1960 decision in The Denton, supra, the District Court for the Eastern District of Texas, affirming a report of Commissioner Brookshire, (in an unreported decision), held that claims for contributions due the trustees for such *welfare and pension* plans did *not* come within the ambit of "wages of the crew of the vessel" *but* that contributions payable to the trustees for *vacation* plans *were* entitled to the priority, ranking and status of seaman's lien for wages. Upon appeal the United States Court of Appeals, following its decision in *Brandon* affirmed the District Court's ruling with respect to claims due the welfare and pension plans, but reversed the lower court's ruling as to claims due the vacation plans. Barnouw v. SS Ozark, 304 F.2d 717 (5th Cir. 1962).

Subsequent to the District Court decisions in The Denton and The Ozark, the District Court for the District of Oregon reached the same conclusion as the Court in The Denton, supra, finding that the reasoning of Commissioner Ross

---

1. See also The Kingston, 1961 A.M.C. 1321 (S.D.Tex.1961) reaching the same conclusion by the same Court.

in that case was sounder than Commissioner Brookshire's in The Ozark. Irving Trust Co. v. The Golden Sail, 197 F.Supp. 777 (D.Or.1961).

In United States v. Embassy Restaurant, Inc., 359 U.S. 29, 79 S.Ct. 554 (1959), the trustees of welfare funds (substantially similar to those in our case) contended that contributions due the trust funds from a bankrupt employer were entitled to priority in payment under § 64(a) (2) of the Bankruptcy Act, as amended, 11 U.S.C. § 104(a) (2), as "wages * * * due to workmen." The Court held, however, that these contributions were not "wages * * * due to workmen" and denied them priority.

Libellant trustees greatly rely on United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957) in which the Court held that trustees of welfare trusts similar to those involved herein could recover against the surety for unpaid contributions due the trust funds from the contractor under the contractor's payment bond given pursuant to the Miller Act, 49 Stat. 793, 40 U.S.C. §§ 270a–270d (1964).

However, the Court in *Embassy* has clearly distinguished *Carter* stating in 359 U.S. at 34–35, 79 S.Ct. at 557:

"Nor does the *Carter* case, supra, support the granting of a priority to these contributions. There we dealt with the Miller Act, which granted to every person furnishing labor or material the right to sue on the contractor's payment bond 'for the sum or sums justly due him.' The contractor defaulted and the trustees of a welfare fund similar to that involved here sued on the bond for recovery of contribu-

tions 'justly due.' Our opinion did not hold that contributions were part of 'wages * * * due to workmen.' In fact we pointed out that the trust agreement provided that the contributions 'shall not constitute or be deemed to be wages,' id., 353 U.S. at 217, 77 S.Ct. at 797. The Act having the broad protective purposes of securing all claims that are 'justly due,' we held that the trustees might recover. In short, though the contributions were not wages, they were 'justly due' as a claim within 'the purposes of the Miller Act.' Under the Bankruptcy Act, however, not all claims 'justly due' have priority. They must be within a class, such as 'wages * * * due to workmen.' The claims here are not. If this class is to be so enlarged, it must be done by the Congress."

As the *Carter* and *Embassy* cases read together make clear, the test is not whether the claims for the contributions are made on behalf of the employees, but whether the claims are of such a nature as to come within the protection of the "seaman's maritime claim" considered either in the traditional or statutory sense.

■ For the foregoing reasons this Court holds that the trustees' claims for the contributions are not entitled to the seaman's maritime lien or to preference as "wages of the crew of the vessel" within the meaning of 46 U.S.C. § 953.

This memorandum of decision shall constitute the Findings of Fact and Conclusions of Law as required by F.R.Civ.P. 52. Proctors representing the vessel interests shall prepare, serve on opposing counsel for approval as to form and lodge with the Court a final judgment for each of the five cases herein.